I'm going to let you pronounce your name because I'll probably mess it up. It's Cole, like a local coal. Like a coal, alright. In the previous case we had C-O-L-E. Somewhere along the way my ancestors stuck out. A couple of letters in there. Okay, Mr. Cole. So good morning. We contend that this record shows fact issues, probable fact issues about the product market. And what I wanted to focus on today are a couple of issues that I don't think were fully developed in this report opinion. And I think go to the fundamental question of why a majority of people in these markets act the way that they do. There's a number of different theories in the briefing about ways you measure a product market. But I found in reviewing it that the Brown Shoe factors were a good high level guide to key things you look at, no matter what label you put on it. And I wanted to start with the factor that examines the uniqueness of the customers, the distinctness of the customers, I think is the exact words that Brown Shoe used. And the record on that not really developed in the district court opinion, but it's largely undisputed. That general acute care hospitals have a uniquely strong demand for disposable medical supplies. That's what they need to do their work. And they need not only a wide range of them to do the things you do as an acute care hospital, they need a lot of them across the range of products, just the range of services that they offer. And that distinguishes them from other hospitals, non-acute care hospitals, clinics, so on and so forth, many other people. They are distinct. So is the market in this case limited to acute care hospitals? Because everybody needs those supplies, right? That's true. So one market is acute care hospitals buying through GPO systems. The other is companies that are in the physient network. Again, that's general acute care as well. So, yes, that's the foundation for both the markets. It's that particular demand, the uniqueness of that demand, which in turn allows a lot of things that we challenge as anti-competitive behavior. Once I'm in the door and I have something, I have a platform that is uniquely good for you, I can add various things onto that that there is a dispute about as to whether or not they're appropriate or anti-competitive. The statistics on this are pretty clear. The physient recognizes it as well. They call them in their market statements vastly different customers when they're characterizing how these companies buy. We cite the Whole Foods case, which examined the market for organic food and perishables. And, yeah, okay, a lot of people sell food, a lot of people buy food. That particular way of packaging it was a unique market right there. And it in turn cited, and the currents expanded on that, the Staples case, which looked at who buys office supplies and why and how, including the big box stores are themselves a unique product line. And so that's the same force in those cases as what we think drives the market definition in this case. So that's the first factor. We start with that. There's another ground shoe factor. Again, it's ground shoe. I think it speaks to all the different theories of product market measurement in this case, which is industry and public recognition. Is this something known only to a few people or is it widely known? And obviously the hospitals make no secret about what their needs are. But physient, and I appreciate that antitrust cases often involve the bad email from the defendant or what have you. But there is a series of PowerPoints in this case that's not, they're not mincing any words, physient, about their goals. They talk about, in the citations from the briefing, protecting the market share leader, protection from competitive threats, locking out competition. And in that same discussion, it's their own discussion, they're discussing it with people to buy from through their GPO system. They then lead into the discussion of the various things that we challenge in the case, it's anti-competitive, exclusive dealing arrangements, rebate programs, and so on and so forth. So it's, there's customers that have unique need. It's known to everybody, including physient, including everybody physient talks to repeatedly. And there are activities that they then can engage in that are unique to those customers, unique to the GPO system. And they have expanded over time, which is a reason why some of the statistics cited in this report may have gotten a bit stale. In particular, they have developed their own product. It's called Nova Plus, and you can sign up for Nova Plus, and it buys and sells. It's a way of packaging and bundling within their overall system. So those three parts of Brown Shoe, the distinctiveness of the customer, the awareness of it, and then the actions that take different prices and terms, this is the language of Brown Shoe. They're relevant to Brown Shoe, but they're relevant to every other way product market is talked about, whether it's considered as a cluster market, or you consider it as a sub-market, or you consider it as just a high-level market. Those factors are what drives the question in all those doctrines of practical substitutability or reasonable substitutability. They're not. Doesn't Brown Shoe relate to sub-markets? Yes, it does. It talks about shoes, and it concludes that women's shoes, men's shoes, and kids' shoes are separate, using these factors. And that's the whole thing, the way those factors apply. My point here is just those factors are ways of talking about what makes a market distinctive. Can you point us to any case law that says you apply the Brown Shoe factors outside the sub-market context? Well, sure. Look at Whole Foods, for example. It looked at the type of product and the type of person buying it, what their unique interests were. It didn't use the Brown Shoe factors, per se, but it clearly looked at the same three things I was just talking about. Is there a unique demand? Is there a unique awareness of it? And are there unique prices associated with it? Can you point us to any case law that says a court must assess every Brown Shoe factor for looking at sub-markets? So, no. I mean, the district court has discretion in what it looks at, but, of course, it has to examine the material ones to make a meaningful analysis. And the material ones are the ones I've just described. And where I think we got off here was the district court, I think, bypassed some of the factors that I've been stressing about, why the majority of the market is the way it is. These people are locked in because of their needs. And there's this statistic that's bounced around the briefing that kind of took on a life of its own. It's this 30% thing that says that some years ago there was a government study, I forget the agency, that concluded that about 30% of customers of GPOs left the GPO space during that year. And that statistic, so argued the district court, shows that these people come and go. They're not reasonably substitutable, and everything else kind of fell into place from there. Two points. That statistic, whatever power it has, has nothing to do with the rest of the market, the other 70% majority. If we're right that that majority has unique needs that everybody knows about that's being priced in a unique way, that's not reasonably substitutable with the rest of it. There's always somebody at the margin. But there also, as I understand, there was no evidence about why they left, right? That's true. We don't know why they left 10, 15 years ago. I think there is evidence to suggest that they were kind of doing both things, that they continue to be in some kind of a GPO. It's a great majority. So they were probably hospitals that, because of their unique demand, were able to use a little less GPO and were more direct. But whatever that motive may be, whatever that reason may be, the other majority, the 70-plus percent, we think, didn't move. And we think there are good reasons why they couldn't move, particularly today. Remember, the study was 10 years ago. What's happened since then? Well, Vizient's offerings have gotten – I have a question. Well, I'm going to come back to Brown's shoe, but please finish your point. So why does it matter? It's an old study. Well, Vizient's offerings have gotten a lot more sophisticated. Launch Nova Plus, a number of other things. The market has gotten much more consolidated. Vizient itself has grown a great deal, and now there are three big GPOs. So the factors that we talk about as to the majority of the market, I think, are even more important now than what may or may not have driven that 30 percent back in the day. Do the Brown's shoe factors change the requirement that a market include all reasonably interchangeable goods? I think they're a way of describing the reasonably interchangeable goods. I think that all of these different tests about product market and ways of talking about it ask that question. Are they reasonably interchangeable or practically interchangeable? It goes back to DuPont, I think, is the name of the case. And so we've had some of them talk about submarkets, and some talk about larger markets, and some talk about cluster markets. But every one of them, the question is, is there an actual antitrust product market where there's a serious substitutability issue? And we contend for a majority of the people, there is a serious question. Some marginal customers come and go. The majority is locked in, and factors explain to us why that is the case. If the district court focused on the lack of identification of reasonably interchangeable goods, then how did it err by not addressing all of the Brown's shoe factors? Well, so the good – I don't understand the goods point in the district court, because we don't dispute that surgical – I mean, that's the whole point of this market. Surgical masks are surgical masks. Our case, though, is about channels, right? It's about the whole food store. It's about – in the case we filed the other day, it's about SABRE, what they call homing. It's about the way things are sold. So, yeah, I get it that you go buy a surgical mask there or a surgical mask there, but the way in which the masks are sold is the markets that – or the markets that we're describing. And there are very serious questions about suitability. General Acute Care Hospital, with its unique needs, that's been with Vizient for a long time, is not going to switch to go direct. There's no evidence that anybody did that. Way back when, some years ago, some people added direct to their lineup, margin. The majority of people stayed right where they were. So I hear the point about goods. We're not arguing that somebody's trying to monopolize masks, bandages, syringes, or any of those things. It's a sales channel case. It channels the market like it was in Staples, like it was in Whole Foods, and like it was in the SABRE case that we filed a couple days ago. Your first issue is that there's a fact issue. What specifically are the fact issues here that precluded summary judgment? Well, there's – the question, there's a long instruction that would go to the jury with the ABA pattern instructions that this court has generally approved. But I'm not looking at the instruction. This is summary judgment. What fact issues did you identify in the record? So the question is, are they substitutable? Well, what are the questions about that? Are, in fact, there a distinct group of customers? Is that something that makes it not substitutable? Is there awareness of that? Is that known in the market? That's something that would guide whether or not there's substitution. Are there pricing differences? We contend that there are substantial pricing differences between the general acute care customers and other people, which is the question under those pattern instructions. They say no. But where's the fact issue? If the district court looked – well, let me back up. The district court only looked at your expert's testimony, correct? There's one statistic in the expert's testimony, but correct. District court didn't look at or rely on Vizian's expert testimony. Okay. So if the district court is looking only at your expert testimony to determine whether you've met your summary judgment burden here and found that it didn't, where's the fact issue? Because the district court didn't look at the entirety of what Matt had to say and what we have explained legally about what the relevant market is. The district court said, I don't think it's substitutable because 30-odd percent of these people changed markets a number of years ago, and as to the Vizian market, there's an issue about a single brand market. Those are the two main points. Both of those are debatable. The issue about 30 percent is wildly a fact issue. That's hotly disputed in the record below, and it's only part of the relevant question. The rest of the market has to be considered, and we briefed the stuffings on that in our summary judgment papers. If the district court only looked at your expert, how's it hotly contested? It didn't look at all the experts. It looked at a factor about whether these people had changed in the past. It didn't look at the people who didn't change. There's no discussion of that in the district court's opinion. And if 70 percent of the market is locked in, can't change because it's not reasonably substitutable, and our expert says all that and we quoted all that, those are fact issues. Those are issues that if compared to what the district court said would totally create a tribal question. I get it. He looked at our expert, but he didn't look at the whole presentation or our entire set of findings about that. Now, you mentioned the single brand market. You seem to disclaim that in your briefing. Are you relying on the single? No. It doesn't apply legally, factually. It doesn't apply factually because it's everybody, the GSEs that are in the Vizian network, anyone that sells to that group of customers, that could be through Vizian, that could be through GPO, that could be direct. It's just that particular group. Where it comes from, who knows? In that sense, it's somewhat broader than the other markets. Legally, the cases that are cited in the hypothetical in the district court are cases where the claimed single brand market with a failed brown shoe or failed substitutability, like the water burger example. Everybody knows you can get another hamburger. But if you have something that survives the brown shoe factors where there is reasonable substitutability, the fact that one brand is widely used in that is not by itself dispositive. The question of substitutability comes first. That was our point in the trial court. That's our legal point here, the only factual point. Thank you. You saved time for rebuttal, Mr. Cole. Thank you. Mr. Guthrie? Good morning, Your Honors, and may it please the Court. Andrew Guthrie for the Vizian Tappalese. Antitrust cases can often be pretty complex, and you heard some efforts from Mr. Cole this morning to make this one sound complex. But this appeal is not. There was a lot of issues raised below, but the district court decided this case on the most basic prerequisite of any antitrust claim, and that is the failure to define a legally sufficient antitrust market. Proper market definition drives everything in antitrust cases. And so this court and others routinely grant judgment as a matter of law when the plaintiff fails to propose a legally sufficient market. This was another one of those cases, and this gets to the questions that Judge Ramirez, you were asking about reasonable interchangeability. And I want to go there first. So Endure and its expert here, Dr. Lawrence Smith, proposed two antitrust markets that were both artificially narrow and therefore legally insufficient because they did not capture all interchangeable substitute products. And that is the key test. You heard it here from Mr. Cole. Even this Brown Shoe idea that I'm going to address in a second. Brown Shoe is not going to control this case for reasons that I want to talk about in a second. But the core theory under this court's case law is, does the proposed market include all commodities that are reasonably interchangeable by consumers for the same purposes? These markets unequivocally do not, and Judge Ramirez, you were getting to this point, that is based on evidence from their expert. From Dr. Lawrence K. Smith's report offers evidence to show in multiple different respects how the, let me start with the GPO DMS market. There was some discussion there at the end about the Vizient DMS market. I think I can hit that more quickly. But before you go there, and don't lose your point, the counsel opposite said the trial court didn't consider all of his expert's testimony. Is that fair? Is that true? No? I don't think it's fair. I don't think it's true. I think the court took a look at the expert testimony. And let me tell you why it's not fair. The primary reason why I think that's not fair is because what the district court did is just follow the guidance that this court gave in the doctor's hospital case. So doctor's hospital was a case where the plaintiff's own expert tried to define a relevant market. But in his expert report, he offered, quote, powerful evidence of the alternatives that are available to consumers. That roughly 30% of consumers in his proposed market left the market to get healthcare. And so what this court said in doctor's hospital was, well, there's pretty powerful evidence of alternatives. Because it's not included within the market definition, the market fails as a matter of law. That's what happened here, right? So the proposed market definition here for this GPO DMS market, there were several limitations. We think it failed on basically every one. But I want to restate what those limitations are so we know what we're talking about, right? Endure proposed a market for the sale of these 12 district DMS products by suppliers through GPO contracts to GAC hospitals. That goes to your question, Judge Smith. It's limited to GAC hospitals, just one kind of consumer. I want to talk about that in a second. Right now I want to focus on that limitation that says this market is limited to sales of these products, these DMS products, but only as through GPO contracts. There is no factual dispute. Hospitals can and do go elsewhere to purchase the exact same products. And let me come back now to what their experts said. There are actually two independent sets of data that satisfy or I guess are fatal under doctor's hospital, proving that the consumers, the general acute care hospitals, go outside this market. And they're actually kind of similar numbers. So I want to be very clear about which is which because what I heard Mr. Polk today only talking about one. The first set of data, again, this is from Endure's expert report, this is from Smith, showed that 30% of GAC purchases happen outside of GPOs. This is not about who leaves GPOs. This is about purchase data. But we don't know why, right? We don't know why, Your Honor. But the question here is, are there alternatives available? So they do it. It doesn't matter why they do it is your point. That's exactly right, Your Honor. Under this court's precedent, the question is, and as a matter of fact, the question is not even where do they go right now to purchase the products. This is the surgical care center of Hammond case. Makes the point, the question isn't where they go right now. The question is where could they practically go if a competitor were to raise prices on those same products? That's the question. Can they go elsewhere? And what the court's precedent says is if the plaintiff has drawn a box so narrow that there are interchangeable substitutes outside of the market, then it's not a legally sufficient product market. Because the point of the relevant market analysis is we want to define the entire area of competition. Because that's what's going to drive how we evaluate the antitrust case. Is there market power? Are there anti-competitive effects within that market? And so if there are available options to get the same products outside of the market, then it fails as a matter of law. Let me ask you a context question, not to throw you off. Give me a one, two, three. Tell me what the quality of the summary judgment record consists of. Check me out. What does the summary judgment record that's made before Judge Starr? Just give me quality. I guess there's a transcript or a deposition of their experts. Yeah, so there was... If you can, just kind of tick it off. Sure. There's three expert reports from their expert. There were several chances that they took to try to get this right. And actually, with their response brief in support of the summary judgment, they filed an entirely new declaration to lay this out. But let me just take it on its face. It was really they were relying on these three expert reports. And what their experts said, again, he offers this evidence to show that... Hold, hold, hold. Three expert reports, but by the same person? By the same person, by Loren Smith. There was a first report. There was a second report. Then there was a declaration that they filed with their summary judgment response that was sort of the greatest hits of the two expert reports before. And is that from the same person? From the same person, from Loren Smith. I got that. Now, what else? I think there was deposition testimony. I will say they primarily relied on Loren Smith's testimony. Let me give a caveat. You heard a few things here about the conduct of business programs, about a few emails. None of that matters for relevant market definition. The first thing you have to do in an antitrust case is you have to define a legally sufficient relevant market. And we made this point in our brief. They actually agreed with us that expert testimony is necessary to define a relevant market. They cited the Colsa case out of the 11th Circuit in their briefing below. And they said you cannot create a market definition based on lay testimony. So we know expert testimony is necessary. So they relied almost exclusively on this Loren Smith expert testimony. That's why Doctors Hospital is so salient. Because in those expert reports, Loren Smith showed, as I was talking about a minute ago, of the GAC hospitals that are in the market, 30% of their purchases are outside of the market. That's one set of data that fails the analysis under Doctors Hospital. The second set of data, he talked about this a little bit today, is the data showing that over the course of years, of the hospitals that have left Physian's GPO, roughly 30% left GPOs altogether. Demonstrating, jumping into your question, it doesn't matter why they left. The fact is, they left. So they obviously viewed the non-GPO route as an interchangeable substitute for getting these same products. So the case rises and falls. I mean, this is an overstatement. But essentially, the qualitative nature of the summary judgment record, a la their expert three reports that the district court reviewed all of that and still came to the legal conclusion that it doesn't satisfy the market. Case open. That's right, Your Honor. And to Judge Ramirez's question, he did look primarily, if not exclusively, I can't remember, but this is about their expert. And Mr. Cole made this point in their briefs that, well, this is just a battle of the experts. He didn't rule on Daubert. He didn't rule on expert admissibility. We don't need you to reach Daubert for expert admissibility in Rule 702. This is about the legal sufficiency of the expert testimony that is in the record. And in Doctors Hospital, in that surgical care center of Hammond cases, those were two cases from this court where the court looked at expert testimony. Didn't pour them out on Daubert. Didn't say these are inadmissible. These are bad expert opinions. Said that they are legally insufficient to prove a valid antitrust market. That's the most straightforward thing for you to do. And that's what Judge Starr did. If you read Judge Starr's opinion, because he didn't rule on the Daubert motions, he essentially took the expert testimony as admissible, held it was still legally insufficient. We think that you can do the same thing. And I do want to point out, because I think maybe this will help your analysis, we've got the cases from this court that I think show why we win. But we pointed to a very similar case from a sister circuit in a GPO case that resolved a very similar market definition on these similar grounds. And that's the Southeast Missouri Hospital case out of the Eighth Circuit. The plaintiff there proposed a market for Foley catheters sold through GPO channels to hospitals, thus excluding the very same catheters sold outside of GPOs. I mean, it's hard to find a much more direct analog than that. And what the Eighth Circuit said is that market's too narrow. As a matter of law, affirmed summary judgment, because the plaintiff hadn't proven there was anything different about Foley catheters sold through a GPO, Foley catheters sold outside of a GPO. And frankly, just like Smith did here, the expert in that Southeast Missouri Hospital's case tried to justify this narrow market by relying on this so-called hypothetical monopolist test. But what the court there said is, there's no hypothetical monopolist analysis. You, the expert, just kind of say it. There's no market studies. There's no economic evidence to prove that analysis. All of that is true here, so the results should be the same. Let me talk now, I promised that I would get back to ground truth, because what I just referenced was the market definition methodology that Indora's expert chose to use in his expert reports. He said, I am going to rely on the hypothetical monopolist analysis. That's what's written into his expert reports. Indora barely defends that analysis on appeal. There's like a paragraph in their opening brief. Instead, what they've done on appeal is they've tried to sub in a few different market definition methodologies. That doesn't work. Let me start with ground truth, because that's what he did. Their expert never mentioned the ground truth factors in his expert report. This was something that they came up with in their summary judgment response, because I think they realized their expert analysis had a problem. Again, I want to emphasize, we're all in agreement that expert testimony is necessary to support a proposed market definition. Because their expert did not cite ground truth, did not discuss the ground truth factors, certainly did not perform a ground truth analysis. Ground truth isn't in the case. We cited this court's opinion in the Illumina case that kind of makes the point that ground truth methodology and the hypothetical monopolist test, those are two separate ways to define a market. In this case, Indora's expert, Dr. Smith, chose to use the hypothetical monopolist test. He did not touch the ground truth factors. Now on appeal, and maybe you heard some of this here today, Indora has said, well, he said a few things that sounded a little bit like the ground truth factors. So basically, his analysis is close enough. But close enough isn't how expert testimony is supposed to work. An expert has to disclose the methodology that they're relying upon and has to do a reliable application of that methodology. Smith didn't do either. So ground truth isn't in the case. I think even if you ignored all that and took it on, Judge Starr's opinion shows why the ground truth factors don't support a standalone market here. The main point, and I think maybe Judge Ramirez, this goes to your question, the ground truth so-called practical indicia, they just go to the same question of, does the market include all reasonably interchangeable substitutes? This court's opinion in the CE services case made that point. That, OK, maybe you can point to one or two ground truth factors, but that market can still fail as a matter of law if it doesn't include all reasonably interchangeable substitutes. I think that's what Judge Starr found in his analysis. He said, I can see the evidence that hospitals can and do go outside the market, so you haven't captured all reasonably interchangeable substitutes. The Southeast Missouri case is actually another good reference. I'm going to run out of time here, but it's another good reference for how a very similar market fails the ground truth factors. He talked about a few of them. Let me just hit them quickly. This unique demand idea, that goes to the same point I just made about the Surgical Care Center of Hammond case. The question isn't, what is hospitals' preference right now? The question is, where could they go for alternative sources of the product if a competitor were to raise prices? So that doesn't do the trick. So in his reply brief, Mr. Cole mentions four different distinguishing factors from the Southeast Missouri hospitals. I mean, factually on its surface, maybe it seems very similar, but can you address the differences that he points out? I sure can. So the first difference he points out is that the plaintiff there is a hospital, not a supplier. That doesn't make a difference when the analysis is, do we have a relevant product market that passes muster as a matter of law? So when the markets are defined so similarly, that was Foley catheters through GPO contracts, we've got DMS. That distinction doesn't make a difference. The other distinctions I think he points to are, he said in that case, the GPO prices were lower. In this case, the GPO prices are higher. That's not true. There was evidence in that case that other people sold the same products for lower. And the hospital just chose to buy the products through the GPO because their physicians wanted it. Because that was the product that they wanted to use. And this goes to a greater antitrust point. There's a lot more than price that goes into purchasing decisions. And so, Judge Smith, I think I ticked through maybe three or four of the factors. My point is those distinctions don't make a difference to the relevant market analysis. First, he said BARD concerned a class action. Second, BARD concerned a market composed of only two types of catheters. Third, there was no debate in BARD whether contracts were awarded through a competitive process. And fourth, the BARD physician showed a preference for BARD catheters, but no physician preference exists here. Yeah. Maybe the only one that I didn't mention goes to the anti-competitive elements about whether we have an exclusive deal here, whether the challenged arrangement substantially forecloses competition in the market. Those are alternative grounds for affirmance. We think you could affirm on that basis. And we think those so-called distinctions from southeast Missouri hospitals don't hold up under the briefing that we put on appeal. But I don't think you have to get to any of those things because the relevant market fails at the outset. I'm going to run out of time here, so let me very quickly hit the Vizient DMS market. This was his second proposed market. And this is a market that is narrowed down to just sales to Vizient members. And that should raise alarm bells right off the bat because this court has often recognized that when you narrow a market to a single brand, you're presenting a skewed economic picture. Judge Stewart was on the panel in New Orleans Cemetery's case that made the point of, like, you can't just narrow it to products that the alleged monopolist controls because every monopolist, or every company is a monopolist in the sale of its own product. So this single brand scrutiny applies whenever you've got, we signed a case law that applies it to markets that are narrowed to just a defendant's customers. They came back with nothing, right? I think maybe it wasn't Judge Smith today who made the point that in their briefing, right, we said, if you're going to do a single brand market, it doesn't mean it automatically fails, it just means you have to meet a heightened showing. Judge Smith, you wrote the PSKS case. You have to show that the consumers are locked into that brand's products by the nature of the product. Because again, there are no interchangeable substitutes. They didn't try to meet that test. They just said it doesn't apply. But they didn't cite any authority suggesting why it doesn't apply. We cited authority showing that this single brand scrutiny applies to markets just like this, which is frankly, Your Honor, is what makes the 28J letter so strange. This is the quote-unquote new authority that was filed yesterday. In the Sabre case, they applied the single brand test. They looked at whether the travel agencies in the Sabre case were locked in to the defendant's system and found, as a matter of fact, they were locked in. Okay? So when they cite that case now and say it supports their position, it doesn't. It supports a position that they've waived on. But as a matter of fact, the evidence affirmatively negates that test because it shows that consumers are not locked in to Vizian's GPO. Again, endures expert. Cited evidence showing that hospitals have left the GPO over the years. And so I see my time is out. I think I've hit everything I need to hit. But for those reasons, both of the proposed markets fail as a matter of law. Judge Starr properly resolved this case on that basic prerequisite, and we'd ask that you affirm the decision to allow it. Thank you, Your Honors. All right. Thank you, Mr. Guthrie. Mr. Cole for rebuttal. Yes, Your Honor. I'd like to touch on two factual details and one broader point. First factual detail. So there are two different 30% numbers running around here. I talked about the substitution number in the opening. The other is this 30% of where they source things from. Check the record site on that. That's talking about all sales, not just acute care hospitals, and that gives away the game. Our whole market definition is premised on the unique needs of those hospitals. The statistic doesn't match up. It's probative? Sure. It's not inclusive. Second point. Jefferson Hospital does not establish some bright-line rule at 30%. It's a geographic market case to start with. And it's at Headnote 12. It draws a map. It says the East Bank of Jefferson Parish is not distinct geographically. They are not separated by natural boundaries and are connected by numerous roadways. And then it offers about a half-dozen facts about how people come and go from the East Bank of Jefferson Parish, which makes sense. I actually went and looked at a map. It's not a geographic market. So, yes, there are some problems with trying to carve out Jefferson Parish East Bank as a geographic market, and some 30% flow was relevant to that. But that absolutely does not take a 30% statistic that is not applicable and make it a matter of law issue. The broader point. Let's talk about reasonable substitutability, whatever 30% there may be. Let's talk about the majority, which is not disputed. The substantial majority, enough to create a risk of monopolization under the applicable precedent. Let's say you're a general acute care hospital, and you're faced with a price increase from Vizient. Well, okay, let's go direct. Let's follow the lead, what Vizient's counsel says to do. The record shows, and our expert, Mr. Smith, and another expert, John Strong, who's an industry type of expert, talks about the details of this. If I do that, I'm not just making a decision based on price. I have to give up my loyalty rebate. I have to deal with a bundling problem, where now I don't know where I'm going to be getting certain products from, because I can't just drop the one with the price increase. I'm tied to a whole bunch of other things. I have compliance penalties I have to deal with. And I may not be able to act, because there are staggered contract terms. The way Vizient has set it up, it's difficult to say, I'm out of here because of that price increase. I can't. The contract's still in place. I have to deal with it. So the price difference that might drive me, as a general acute care hospital doing business with Vizient, to go direct is not just a little increase. I've got to pay a tax if I'm going to go direct or go somewhere else, and that tax is significant. It is material. How much is it varies depending on the hospital, but the bigger the general acute care hospital, and the longer they've been with Vizient, the more likely it is they've got these things snarled all around them, because over time they add on and they add more incentives, and the tax gets that much higher. Right. Dial it back. We're in summary judgment. You heard my question about what is the quality of summary judgment, the evidence you heard counsel officers' response. You're trying to stay in court. You're out of court. You're bounced on summary judgment. There's no argument that summary judgment can't be rendered. What is the genuine material issue of fact that needs to go back? Counsel officer has articulated down to what your expert said, et cetera, et cetera, et cetera. All of that is saying Judge Starr made a legal conclusion. What is your convincing argument to us of what facts, facts that go to this market that need to be discerned in summary judgment? Otherwise it just seems you're arguing about the legal problems. We need to know if people can switch. That's the question. And Judge Starr said because 30% of the people switch once, it's a matter of law. They can switch and that's enough. I don't think that's enough. There's a substantially greater group. How big? We don't know exactly. 70% maybe larger. How big is that group? How deep are they in with Vizient so that they have to pay a big tax to get out, the size of that tax? There are some marginal customers. They come and they go. They have whatever demands they want. But for the majority of the people, how big is the majority? How big is the tax if they're faced with a price increase? And our expert talks about all of the details that go into that. A jury would hear that and they would make a determination about that. If a jury just heard what's in the district court opinion, it wouldn't be hearing a full record. The district court needed to review the entire market and that entire scope of the expert report to answer the substitutability question. How do we know, looking in the record, that the court didn't completely review everything you just said? I mean, it's one thing for you to say, but. I just read the opinion. The opinion says 30% in Doctors Hospital and this business, not single brands, and that is not complete. That is not a majority of the market, which the novelization claims are about, and it doesn't deal with why we say the prices are sticky and they're not substitutable. The court may have looked at it, but there are questions raised when you do look at it. And that's why I haven't looked at it. Well, appeal is from, I always learned, appeal is from the judgment, not from the reasons. And so, you know, axiomatically, you've got to show the judgment is wrong. I'm not saying you haven't, but I mean, we complain all the time when the judge doesn't say this, doesn't say that. That doesn't necessarily mean the judge didn't consider it. You accept that the burden is on you to establish to your expert, et cetera, et cetera. Point being, but what you just said, these things that a jury could consider, then I have your argument. I just, I always state to kind of the basics that you've got to flip a summary judgment. Iqbal, our signal case in 12B6 is an antitrust case. So clearly people can get poured out real early in an antitrust if you can go out on 12B6. So here you're on summary judgment and that's it. Latter point, of course, your 28J you filed yesterday is not new law. And you know, I found it and I wanted to give it to the court. I found it and I wanted to give it to the court. Well, read 28J. It says new authority, not something just discovered. This is an FYI. It's annoying when we get a 28J that some case has been out for a while. It's how to substitute for the briefing. That's just not for you, but for anybody. We get it. Presumably it's something that wasn't on the book. Anyway, you're on the red light. Just thought I would pass that along. I appreciate it. Thank you, Mr. Koh. Your case is under submission.